

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-28-2006

# Torisky v. Schweiker

Precedential or Non-Precedential: Precedential

Docket No. 05-1496

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Torisky v. Schweiker" (2006). *2006 Decisions.* Paper 1166.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1166

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 05-1496

_____

DANIEL TORISKY, as guardian of his son Edward A. Torisky; LAURA MOONEY, as guardian of her sister Susan Riley; KENNETH AMMONS, as guardian of his son Kenneth Ammons, Jr.; ALBERT BAUMGARTNER, as guardian of his son George Baumgartner; CHARLES CIHIL, as guardian of his son Richard Cihil; PATSY CONCA, as guardian of his son Mario Conca; JOAN CONNORS, as guardian of her sister Helen Connors; PETER DEMCZYK, as guardian of his son Max Demczyk; GUY DI MARZIO, as guardian of his brother Carlo Di Marzio; ALDO GIANNINI, as guardian of his son Ronald Giannini; MAUREEN PUSKAR, as guardian of her sister Dorothy Kohut; JON LACKMAN, as guardian of his sister Elizabeth Lackman; CHARLES MILLER, as guardian of his daughter Dianne Miller; MARY PASINSKI, as guardian of her brother Joseph Pasinski; JEANNE CLAUS, as guardian of her son William Schwartz; KENNETH SMITH, as guardian of his son Larry Smith; GERTRUDE SMORADA, as guardian of her son Dennis Smorada; JOHN TESTA, as guardian of his daugther Christine Testa; GERALD WARD, as guardian of his daughter Sharon Ward; DIANE WRANA, as guardian of her daughter Christine Wrana; WALTER BARANOWSKI, as guardian of his son Leon Baranowski; JAMES E. FORD;

PEGGY FORD, as guardians of their son William Ford; NAOMI DA PRA, as guardian of her sister Marion Hemmis; EUGENIA KOLESSAR, as guardian of her son Gary Kolessar; JOANNE MARTIN, as next friend of her son Kevin Patterson; GREGORY UNDERWOOD; MARGARET UNDERWOOD, as guardians of their son Michael Underwood

v.

 MARK S. SCHWEIKER, as Governor of the Commonwealth of Pennsylvania; DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA; FEATHER O. HOUSTOUN, individually, and as Secretary of the Department of PublicWelfare of the Commonwealth of Pennsylvania; NANCY R. THALER, individually, and as Deputy Secretary of the Pennsylvania office of Mental Retardation

PENNSYLVANIA PROTECTION AND ADVOCACY, INC.; ARC ALLEGHENY; ARC PENNSYLVANIA
(Intervenors in D.C.)

Feather O. Houstoun and Nancy R. Thaler,
Appellants

―――――

On Appeal From the United States
District Court
For the Western District of Pennsylvania
(D.C. Civil Action No. 02-cv-00499)
District Judge:  Hon. Joy F. Conti

―――――

Argued January 25, 2006

BEFORE:  McKEE and STAPLETON, <u>Circuit Judges,</u>

2

and POLLAK,* District Judge

(Opinion Filed  April 28, 2006)

_____

Howard C. Ulan
Daniel M. Fellin (Argued)
Commonwealth of Pennsylvania
Office of Legal Counsel
Department of Public Welfare
3d Floor West - Health & Welfare Building
Seventh & Forster Streets
Harrisburg, PA  17120
  Attorneys for Appellants

Mark J. Murphy (Argued)
Disabilities Law Project
1315 Walnut Street - Suite 400
Philadelphia, PA  19107
  Attorney for Intervenors

_____

OPINION OF THE COURT

_____

STAPLETON, Circuit Judge:

This appeal presents the issue of whether a state's affirmative duty under the Due Process Clause to care for and protect a mental health patient in state custody depends upon the

_____

*Hon. Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

individual's custody being involuntary. Contrary to the District Court's resolution of this issue, we conclude that the state does not owe the affirmative duties of care and protection first enunciated in *Youngberg v. Romeo*, 457 U.S. 307 (1982), to those individuals who are free to leave state custody. We will affirm the District Court's order denying appellants' claim to qualified immunity, however, because resolution of that claim should await fuller development of the record.

## I.

The plaintiffs are the guardians of twenty adult individuals with mental retardation who formerly resided at Western Center, a mental retardation institution operated by Pennsylvania's Department of Public Welfare ("DPW").[1] On April 11-12, 2000, DPW closed Western Center and transferred its remaining residents, including the plaintiffs in the present litigation, to privately operated facilities. At the time of the closing, the plaintiffs were "unwilling to be transferred to placement in community facilities of any type," "medically and developmentally inappropriate for community placement," "medically and mentally fragile, especially when removed from their familiar institutional surroundings," "in need of continuous care by on-site multidisciplinary staff," and "in need of continuity of placement; stability, and therapeutic access to family." Am. Compl. ¶ 9.

In the course of the transfer, "a physical blockade was set up by state police at Western Center to separate plaintiffs from their parents, guardians, relatives and other loved ones." *Id.* at ¶ 40. "Against each plaintiff's will, each was prevented from making physical contact with any individual on the other side of the blockade; was ordered into and placed within a bus or van at

---

[1]We will refer to the individual former residents of Western Center as the "plaintiffs" throughout this opinion.

4

Western Center, and was then transported to various placements several hours away." *Id.* at ¶ 41. Plaintiffs allege that state employees utilized "[p]hysical and psychological force" and that the plaintiffs "suffered severe physical and psychological damage in the forced, involuntary transfer from Western Center." *Id.* at ¶¶ 18, 42.

The plaintiffs, through their guardians, filed suit in the Middle District of Pennsylvania alleging violations of 42 U.S.C. § 1983 and other federal and state statutes. In their complaint, the plaintiffs allege that the defendants violated their "constitutional life and liberty interest in . . . appropriate placement and appropriate medical and therapeutic treatment from the state of Pennsylvania." *Id.* at ¶ 12. They further allege that the individually named defendants, including Feather Houston, the Secretary of DPW, and Nancy Thaler, the Deputy Secretary, "were personally responsible for the decision to transfer each plaintiff." *Id.* at ¶ 43.

Based on these allegations, plaintiffs sought injunctive relief under the Due Process Clause. In Count V, the only claim currently before us, the plaintiffs sought monetary damages from the individual defendants Thaler and Houston based on the same due process violation.

The defendants moved to dismiss, asserting, *inter alia*, that defendants Houston and Thaler were protected by qualified immunity from plaintiffs' damage claims. The District Court viewed the issue as whether the substantive due process rights to care and protection possessed by "involuntarily committed residents in state facilities" under *Youngberg v. Romeo*, 457 U.S. 307 (1982), "are clearly established as extending to voluntarily committed persons." App. at 30-31. The District Court concluded that it was clearly established that such due process protections do extend to those who are voluntarily committed and denied the motion. We will affirm the order of the District

5

Court, albeit for a different reason.

After Houston and Thaler filed this interlocutory appeal, the plaintiffs failed to enter an appearance or file a brief. Houston and Thaler are entitled to pursue their appeal, however, and we are required to proceed without the benefit of an appellee's brief. *United States v. Everett*, 700 F.2d 900, 902 n.5 (3d Cir. 1983) ("If an appellee after proper notice fails to file a brief, then we may decide the case on the brief of the appellant only."); 16A *Wright, Miller, & Cooper*, *Federal Practice & Procedure* § 3974.2 at 525 (3d ed. 1999); *cf.* Fed. R. App. P. 31(c).

## II.

The District Court had jurisdiction over the plaintiffs' constitutional claims under 28 U.S.C. § 1331. We have jurisdiction to review the District Court's denial of qualified immunity pursuant to the collateral order doctrine. *Rouse v. Plantier*, 182 F.3d 192, 196 (3d Cir. 1999); *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985).[2] In reviewing a denial of qualified immunity at the Rule 12(b)(6) stage of litigation, we accept the plaintiffs' allegations as true and draw all inferences in their favor. *Larsen v. Senate of Com. of Pa.*, 154 F.3d 82, 87 (3d Cir. 1998).

## III.

The officials assert qualified immunity with respect to the plaintiffs' damage claims brought under 42 U.S.C. § 1983. They will be entitled to such immunity if "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*,

---

[2]*See infra*, n.6.

457 U.S. 800, 818 (1982)). "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of alleged violation.'" *Id.* (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This second inquiry "must be undertaken in light of the specific context of the case." *Id.*

As a threshold matter, we note that we, like the District Court, read the damage claims before us as resting solely on the substantive due process rights of care and protection recognized in *Youngberg v. Romeo*, 457 U.S. 307 (1982). *Youngberg* addresses only the extent to which the Due Process Clause imposes upon the state an affirmative duty to care for, treat, and protect persons in its custody. *Id.* at 324. We hasten to note that the Due Process Clause, of course, also forecloses the state under some circumstances from taking affirmative action that deprives citizens of interests in life or liberty, regardless of their custodial status. As we pointed out in *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 466 (3d Cir. 1990), residents of state institutions whose circumstances do not qualify them for protection under *Youngberg* nevertheless possess other substantive due process rights to be free of certain state interference in their lives.[3] Because the complaint and,

---

[3]In *Fialkowski*, we explained that a voluntarily committed mentally retarded patient who did not qualify for relief under *Youngberg* would, under the holdings of cases like *Stoneking v. Bradford Area School District*, 882 F.2d 720 (3d Cir. 1989),

indeed, the briefs before us and in the District Court, rely solely on the rights mandated by *Youngberg*, nothing we say about the significance of the voluntary or involuntary nature of confinement in this context is relevant in the context of other substantive due process rights of voluntarily committed persons.

In *Youngberg*, the Supreme Court held that when the state deprives an individual of liberty through involuntary commitment proceedings, it undertakes an affirmative obligation to confine the individual under "conditions of reasonable care and safety" that are "reasonably nonrestrictive" and to provide the individual with "such training as may be required by these interests." 457 U.S. at 324. The Court noted that "[s]uch conditions of confinement would comport fully with the purpose of [the individual's] commitment." *Id.*; *see also id.* at 320 n.27 (citing *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (holding due process requires rational relation between nature and duration of commitment and its purpose)).

The Due Process Clause of the Fourteenth Amendment "generally confer[s] no affirmative right to governmental aid." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). However, the rights recognized in *Youngberg* fit within an exception providing that "when the State takes a person into its custody and holds him there against his will, the

---

have a right to relief in the event that a state actor deliberately deprived him of his liberty interest in personal security. 921 F.2d at 466. Clearly, voluntarily committed persons have substantive due process rights to be free from unjustified or unauthorized government interference with their fundamental rights, such as the right to court access, to vote, and to marry. *See, e.g., Bounds v. Smith*, 430 U.S. 817 (1977) (holding that right of access to the courts is fundamental); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) (holding that right to vote is fundamental); *Loving v. Virginia*, 388 U.S. 1 (1967) (recognizing fundamental right to marry).

8

Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199-200; *Collins v. City of Harker Heights*, 503 U.S. 115, 127 (1992) ("[T]he Due Process Clause of its own force requires that conditions of confinement satisfy certain minimal standards for pretrial detainees, for persons in mental institutions, for convicted felons, and for persons under arrests.") (citations omitted). The Supreme Court explained the rationale for this exception in *DeShaney*:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs–*e.g.,* food, clothing, shelter, medical care, and reasonable safety–it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* at 200 (citations omitted). In other words, "[t]he 'process' that the Constitution guarantees in connection with any deprivation of liberty . . . includes a continuing obligation to satisfy certain minimal custodial standards." *Collins*, 503 U.S. at 127-28. The Supreme Court has stressed that "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf–through incarceration, institutionalization, or other similar restraint of personal liberty–which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *DeShaney*, 489 U.S. at 200.

Following the general rule, the Supreme Court in

9

*DeShaney* ruled that the state owed no continuing constitutional obligation of care or protection to a child who had been previously taken into custody of the state, but returned to the custody of his father. 489 U.S. at 201. Similarly, the Court in *Collins* refused to accept a city employee's argument that the city had a "federal constitutional obligation to provide its employees with certain minimal levels of safety and security." 503 U.S. at 127. The Court reasoned that the plaintiff "cannot maintain . . . that the city deprived [him] of his liberty when it made, and he voluntarily accepted, an offer of employment." *Id.* at 128.

Accordingly, our court recognized in *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 465 (3d Cir. 1990), that "the substantive rights recognized in *Youngberg* are limited to persons whose personal liberty has been substantially curtailed by the state." In *Fialkowski*, we ruled that a severely retarded adult male could not invoke *Youngberg* rights to reasonable care when his parents "*voluntarily* placed him at" a community health center. *Id.* at 465 (emphasis added). In such a circumstance, the plaintiff's "personal liberty was not substantially curtailed by the state in any way." *Id.* We emphasized that "[n]ot only were [the patient's parents] free to remove their son from the [center] if they wished, but [the patient] himself enjoyed considerable freedom of movement. He was thus not deprived of freedom 'through incarceration, institutionalization or other similar restraint of personal liberty." *Id.* (quoting *DeShaney*, 489 U.S. at 200).[4]

---

[4]We similarly ruled in *Black v. Indiana Area Sch. Dist.*, 985 F.2d 707, 713 (3d Cir. 1993), that a school bus driver "stood in no 'special relationship' with the students that would create an affirmative duty of care." We emphasized that "[n]either the state compulsory attendance laws nor any other state rule required [the students'] presence on the . . . school bus." *Id.* at 714.

In the instant case, the District Court erred in concluding that the voluntary nature of one's custody and continued confinement does not impact the availability of the rights to care and protection mandated by *Youngberg v. Romeo*, 457 U.S. 307 (1982). *Youngberg* dealt with an involuntarily committed inmate, and *Fialkowski* holds that the same principles do not apply to individuals who are free to leave state custody "if they wish[]." 921 F.2d at 465.

The intervenors rely on language in some of our cases emphasizing that the relationship between the state and an individual must be custodial in order to trigger an affirmative duty of care between the state and the individual. For example, in *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1370 (3d Cir. 1992), we stated that "[o]ur court has read *DeShaney* primarily as setting out a test of physical custody." But the *D.R.* court went on to explain that

> [t]he state's duty to prisoners and involuntarily committed patients exists because of the full time severe and continuous state restriction of liberty in both environments. Institutionalized persons are wholly dependant upon the state for food, shelter, clothing and safety. It is not within their power to provide for themselves, nor are they given the opportunity to seek outside help to meet their basic needs. *Obviously, they are not free to leave.*
>
> Here it is the parents who decide whether that education will take place in the home, in public or private schools or, as here, in a vocational-technical school.

*Id.* at 1371 (emphasis added). Thus, while the *D.R.* court emphasized that a comprehensive custodial relationship is

11

necessary to trigger the state's affirmative obligation of care and protection, it did so with an understanding that the individual must not be free to leave that custody if he so chooses.

In *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir. 2000), our court held that the state has a "special relationship" and owes affirmative obligations of care to those children it places within its foster care system. We emphasized that the state places foster children "in a custodial environment" from which the children are "unable to seek alternative living arrangements," *id.*, just as the state does for the incarcerated or the involuntarily committed. "In each of these cases the state, by affirmative act, renders the individual substantially 'dependent upon the state . . . to meet [his or her] basic needs.'" *Id.*

It appears that the foster child in *Nicini* originally came into state custody when his father signed a voluntary-placement agreement. *Id.* at 801. However, the state court reviewing Nicini's placement had ordered that "Nicini would 'come[] under the care and supervision' of [New Jersey's Department of Youth and Family Services ("DYFS")], that he would remain with the [alleged wrongdoers] 'for so long as [DYFS] thinks that's an appropriate placement,' and that '[u]nder no circumstances is [DYFS] to return the boy to the home of his parents without the authority of the Court.'" *Id.* at 804 (quoting order of New Jersey Superior Court) (citation omitted). Such an order by the state, but not voluntary placement in custody standing alone, amounts to a deprivation of liberty triggering a "corresponding duty to assume some responsibility for . . . safety and well-being." *DeShaney*, 489 U.S. at 200.

Thus, a custodial relationship created merely by an individual's voluntary submission to state custody is not a "deprivation of liberty" sufficient to trigger the protections of *Youngberg*. Indeed, the Supreme Court has specifically noted that when a patient provides valid consent to enter a state mental

12

treatment facility, there is no deprivation of liberty at all. *Zinermon v. Burch*, 494 U.S. 113, 117-18 n.3 ("If only those patients who are competent to consent to admission are allowed to sign themselves in as 'voluntary' patients, then they would not be deprived of any liberty interest at all."); *id.* at 131 n.17; *see also Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 991 (1st Cir. 1992) ("Because the state did not commit Monahan involuntarily, it did not take an 'affirmative act' of restraining his liberty, an act which may trigger a corresponding due process duty to assume a special responsibility for his protection."); *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (en banc) (A "'special relationship' does not arise solely because the state exercises custodial control over an individual when a person *voluntarily resides* in a state facility under its custodial rules.").

We conclude that appellants go too far, however, when they insist that a court commitment to state custody is a necessary characteristic of a deprivation of liberty sufficient to trigger *Youngberg*'s protections. As the District Court observed:

> [I]t is consistent with the Court's rationale in *Youngberg* to find that the state "may act to restrict an individual's liberty when it either involuntarily commits the individual or, at some point during the term of one's voluntary commitment, takes affirmative steps to restrain one's liberty." 832 F. Supp. at 124. In addition, . . . a voluntary commitment may, over time, take on the character of an involuntary one. *Id.* Such a change could occur [for example] as a result of use of physical or chemical restraints. *Id.*

App. at 22 (quoting *United States v. Pennsylvania*, 832 F. Supp. 122, 124 (E.D. Pa. 1993)).

13

Indeed, even commitments formally labeled as "voluntary" may arguably amount to *de facto* deprivations of liberty from their inception. *See* Sarah C. Kellogg, Note, *The Due Process Right to a Safe and Humane Environment for Patients in State Custody: The Voluntary/Involuntary Distinction*, 23 *Am. J.L. & Med.* 339, 341-43 (1997) (listing "eight overlapping types of commitment, only one of which can truly be considered *voluntary* in the sense that it results from the patient's uncompelled free choice"). In addition, when plaintiffs voluntarily consent to enter state institutions, those institutions may set limits on a patient's ability to leave. *See id.* at 342 ("In a *voluntary commitment*, a facility admitting a competent adult may retain the right to institute involuntary commitment proceedings or demand that certain bureaucratic requirements be met before granting the patient's request for discharge."); 1 Michael L. Perlin, *Mental Disability Law* § 2C-7.2 at 482-83 (2nd ed. 1998) ("Many commentators have suggested that voluntary procedures are 'subject to abuse' or involve 'substantial elements of coercion,' and that the distinction between 'voluntary' and 'involuntary' patients is often an 'illusory' or 'murky' one, with voluntary residents often having even fewer opportunities for discharge than those involuntarily committed.") (footnotes omitted). We note that in Pennsylvania a voluntarily committed inmate may be subject to a waiting period of up to 72 hours before he or she can secure release. *See* 50 Pa. Cons. Stat. § 7206(a).

The existing case law supports the District Court's approach of looking beyond the label of an individual's confinement to ascertain whether the state has deprived an individual of liberty in such a way as to trigger *Youngberg*'s protections. The Supreme Court noted in *Youngberg* itself that "the facts in cases of confinement of mentally retarded patients vary widely" and "it is essential to focus on the facts and circumstances of the case before a court." 457 U.S. at 319 n.25. Courts of appeals have looked to the particular facts of an

14

individual's custody and, in particular, to whether the individual is free to leave state custody. The Eighth Circuit ruled in *Kennedy v. Schafer*, 71 F.3d 292, 295 (8th Cir. 1995), that summary judgment on a voluntarily committed mental patient's *Youngberg* claim was inappropriate when there was a genuine issue of material fact as to whether the patient "may have effectively become an involuntary patient." In *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 992 (1st Cir. 1992), the First Circuit ruled that a voluntarily committed mental health patient could not assert rights under *Youngberg*, but looked beyond the plaintiff's formal status to emphasize that the "complaint did not allege that he would have been barred from leaving" and that it was the plaintiff's "own mental condition alone that impinged upon his freedom to leave, it was not the state that deprived him of that freedom." *See also Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995) (ruling that the state owed no duty to protect a voluntary resident of a state school for the deaf, but examining the record evidence to determine that the plaintiff attended the school voluntarily "with the option of leaving at will, an option that was never withdrawn"). Finally, in a case factually similar to the instant case, the Court of Appeals for the Second Circuit noted in *Brooks v. Guiliani*, 84 F.3d 1454, 1467-68 (2nd Cir. 1996), that even though the plaintiffs' commitment to out-of-state residential treatment facilities did not give rise to *Youngberg* rights, an "involuntary transfer" to in-state facilities would "restrict plaintiffs' liberty" and thereby "implicate the Due Process Clause."

District courts have similarly recognized that patients who have formally been voluntarily committed may nonetheless find themselves in a *de facto* involuntary status. *See United States v. Pennsylvania*, 832 F. Supp. 122, 124 (E.D. Pa. 1993) ("[W]here the initial institutionalization of an individual is made pursuant to a 'voluntary' decision, such institutionalization in its course may become one which necessarily curtails an

15

individual's liberty."); *Halderman v. Pennhurst State Sch. & Hosp.*, 784 F. Supp. 215, 222 (E.D. Pa. 1992) (rejecting argument that "only those residents who were court-committed" should be treated as involuntary residents for purposes of *Youngberg*), *aff'd* 977 F.2d 568 (3d Cir. 1992); *Clark v. Donahue*, 885 F. Supp. 1159, 1162 (S.D. Ind. 1995) ("[E]ven though Plaintiffs concede that the guardians . . . did initially voluntarily commit them to the state, the relevant inquiry must focus upon the actual circumstances of Plaintiffs' confinement.").

Count V of the complaint alleges that each plaintiff was in state custody and was injured physically and psychologically in the course, and as a result, of a transfer to an inappropriate institution. It further alleges that the plaintiffs were separated from their guardians and loved ones by a police blockade, and were transferred "[a]gainst their will," and that "[p]hysical and psychological force was utilized by state employees . . . in the course of the transfer." Am. Compl. ¶¶ 41, 42. We conclude that plaintiffs may be able to prove facts consistent with these allegations that would establish a deprivation of liberty and a violation of *Youngberg*'s duty of care and protection.

While we conclude that a constitutional violation may have occurred, the current record does not provide an adequate basis for passing on the defendants' claim to qualified immunity. Indeed, contrary to the assumption underlying appellants' entire appeal, we do not even know whether any of the plaintiffs were the subject of a court-ordered commitment at the relevant time.[5]

_____

[5]The defendants submitted a Declaration to the District Court indicating that "[o]nly one plaintiff . . . is currently subject to involuntary commitment, and she currently resides at a private facility." Geis Decl. ¶ 7. The Declaration says nothing about the commitment status of any of the plaintiffs at the time of the transfer.

16

Moreover, assuming that none were, it is far from clear that any of the plaintiffs were in a position to extricate themselves from state custody at the time of the transfer that allegedly inflicted their injuries.

## IV.

We hold that the District Court erred in concluding that the state owes an affirmative due process duty of care to residents of a state institution who are free to leave state custody. We will affirm the order of the District Court denying the motion to dismiss on grounds of qualified immunity, however, so that the matter of immunity can be determined on the basis of a more fully developed record. The order of the District Court entered January 27, 2005, will be affirmed.[6]

---

[6]If the District Court, on remand, determines that plaintiffs, whose complaint seeks damages and injunctive relief, are abandoning their damage claim, the District Court will have no occasion to devote further efforts to resolving the question whether defendants Thaler and Houston are entitled to qualified immunity. Our opinion – indeed, our jurisdiction to review the District Court's order denying defendants' motion to dismiss on qualified-immunity grounds – is based on our understanding that plaintiffs have not abandoned their damage claim. Nothing in the record establishes that plaintiffs have abandoned their damage claim. Further, the docket shows that plaintiffs have made some, albeit procedurally inadequate, effort to participate in this appeal. These facts satisfy us that defendants remain at risk of being subjected to further litigation on a claim for which they argue they are entitled to qualified immunity. Accordingly, we conclude that the requirements of the collateral order doctrine are met and we have jurisdiction over the appeal. *See Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985).