**Jeraldine JORDAN et al.**

v.

**STATE OF TENNESSEE, et al.**

No. 3:88–0346.

United States District Court,
M.D. Tennessee,
Nashville Division.

June 7, 1990.

Gary M. Williams, Hendersonville, Tenn., for plaintiffs.

Sharon S. Selby, Asst. Atty. Gen., Nashville, Tenn., for defendants.

Joe P. Binkley, Nashville, Tenn., for Sabrina Louvin.

Don R. Ash, Murfreesboro, Tenn., for Renee Kimball.

## MEMORANDUM

WISEMAN, Chief Judge.

This matter involves the death of plaintiffs' son, Valion Jordan, IV, a severely retarded 10–year–old boy who was a resident at Clover Bottom Developmental Center ("Clover Bottom"). Valion was born on April 2, 1977. For most of his early childhood, Valion required the continuous care and attention of his parents. As a result of his condition, Valion would often walk on his toes around the room aimlessly or in circles and thus required close supervision. On June 29, 1984, plaintiffs chose to admit Valion to Clover Bottom, a residential facility provided by the state of Tennessee for the 24–hour care of severely retarded individuals.

Plaintiffs, usually Mrs. Jordan alone, regularly visited Valion at Clover Bottom. The Jordans often removed Valion from the facility so he could spend the weekend at home with them. From the beginning, plaintiffs made regular complaints to the staff at Clover Bottom about the conditions in Valion's unit. The state contends that these complaints were remedied to the extent possible.

In the evening of April 26, 1987, the door from Valion's building to the outside was left propped open. The state contends that the door was left open because the residents of the unit had earlier been outside under supervision. When the residents are outside the building, the doors must be left open to give the residents access to the restrooms. Plaintiffs, however, allege that the door was propped open because the building was uncomfortably hot. Whatever the reason, the door was left open, and while the staff was occupied with other residents of the building, Valion apparently wandered outside. Once outside, he apparently traveled some 700 feet around a fence, fell into a pond on the Clover Bottom grounds and drowned. Although there was no fence completely surrounding the pond, Valion's building was separated from the pond by a 975–foot fence in a rough U–shape around the building.

Plaintiffs allege a violation of Valion's substantive due process rights by the de-

fendants' failure to provide safe conditions at Clover Bottom. Plaintiffs contend that unsafe conditions existed at the facility due to understaffing, poor maintenance (causing heating problems which led to the open door), the lack of a complete fence around the pond, improper training of the staff, and the act of leaving the door open.

In April of 1989, this Court 1) dismissed all claims against state officials in their official capacities, 2) dismissed all causes of action claimed under § 1983 except those based upon the due process clause, 3) dismissed all pendent state law claims without prejudice, and 4) denied a motion to dismiss the claims against the defendants in their individual capacities. As explained below, the Court now dismisses the claims against the defendants in their individual capacities on the grounds that they are barred by the doctrine of qualified immunity.

*Substantive Due Process*

■ A threshold question in this case is whether the state has a constitutional duty to provide a safe environment for a voluntary resident of Clover Bottom. If there is no such constitutional duty, then the defendants are protected by qualified immunity since they could not have violated any "clearly established constitutional duty." *See Eugene D. v. Karman,* 889 F.2d 701 (6th Cir.1989). In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that an *involuntary* committed resident of a state institution does have a substantive due process right to safe conditions. The Court, however, has not addressed whether that right should extend to *voluntary* residents.

*DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), indicates that voluntary residents are not afforded a constitutional right to safe conditions. *DeShaney* held that a state has a constitutional duty to provide safe conditions only when it, by an affirmative exercise of its power, limits a person's freedom to act on his own behalf. At ——, 109 S.Ct. at 1005–07, 103 L.Ed.2d at 261–63. In *DeShaney,* a 4–year old child suffered sever brain damage as a result of being severely beaten by his fa-

ther. The child's mother sued under 42 U.S.C. § 1983 on the grounds that the child's substantive due process rights were violated. She alleged that the state was aware of the risk that the father presented to the child, but failed to intervene to protect the child from that risk. *Id.* 489 U.S. at ——, 109 S.Ct. at 1002, 103 L.Ed.2d at 257. Although the state placed the child in temporary custody at one time, it later returned him to the custody of his father. *Id.* at ——, 109 S.Ct. at 1001–02, 103 L.Ed.2d at 256–57.

The Court held that the state had no constitutional duty to protect the child from his father. "[The Fourteenth Amendment's] purpose was to protect the people from the State, not to ensure that the State protected them from each other." 489 U.S. at ——, 109 S.Ct. at 1003, 103 L.Ed.2d at 259. On the surface *DeShaney* would seem to be distinguishable from the instant case. Plaintiffs allege injury by the state, not by a private actor. The importance of this distinction, however, is lessened by the Court's discussion of its rationale for denying constitutional protection to the *DeShaney* plaintiffs. *DeShaney* does not turn on the fact that the injury was caused by a private actor, but on the lack of an affirmative act by the state that placed the child in harm's way.

The *DeShaney* Court expressly limited the scope of the rights protected under *Youngberg:*

[*Youngberg* and other cases] stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The

affirmative duty to protect arises ... from the limitation which [the state] has imposed on his freedom to act on his own behalf.

489 U.S. at ———— ————, 109 S.Ct. at 1005–06, 103 L.Ed.2d at 261–62. The three dissenting members of the Court (Brennan, Marshall and Blackmun) argued that the state's duty to provide safe conditions arose when the state undertook to intervene through its social services programs. *See Id.* at ———— ————, 109 S.Ct. at 1007–12, 103 L.Ed.2d at 264–69 (Brennan, J., dissenting). For the majority, however, the important factor was the affirmative act by the state to restrain the individual's freedom. *See Id.* ———— ————, 109 S.Ct. at 1005–06, 103 L.Ed.2d at 261–62.

In the instant case, the state did nothing affirmative to require Valion to remain at Clover Bottom. During Mrs. Jordan's repeated visits to the facility, she registered complaints about several matters with members of the facility staff. In fact, Mrs. Jordan complained more than once that the door to Valion's unit was being left open. Plaintiffs were completely familiar with the conditions at Clover Bottom yet *chose* to have Valion remain as a resident of the facility. Such a voluntary choice, under the *DeShaney* Court rationale, does not give rise to a constitutional duty on the part of the state to provide safe conditions.

Plaintiffs argue that there should be no distinction between voluntary and involuntary residents of state mental health facilities. Plaintiffs cite four district court cases and a case from the Second Circuit which question the voluntary/nonvoluntary distinction. *See Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239 (2d Cir.1984); *Rubacha by Rubacha v. Coler,* 607 F.Supp. 477 (D.C.Ill.1985); *Kolpak v. Bell,* 619 F.Supp. 359 (D.C.Ill. 1985); *McCartney v. Barg,* 643 F.Supp. 1181 (N.D. Ohio 1986); *Fialkowski v. Greenwich Home for Children, Inc.,* 683 F.Supp. 103 (E.D.Pa.1987). In *Society for Good Will to Retarded Children v. Cuomo,* the Second Circuit refused to limit the right to safe conditions to involuntarily committed residents.

We need not decide whether ... residents are ... "voluntary" or "involuntary" because in either case they are entitled to safe conditions and freedom from undue restraint. First, prior Supreme Court holdings suggest that there is a due process right to freedom from governmentally imposed undue bodily restraint for anyone at any time. Furthermore, *Youngberg's* reasoning and reliance on Supreme Court precedent also suggest that anyone in a state institution has a right to safe conditions.

Second, *Youngberg* stated that even prison inmates who are being punished by incarceration have a right to safe conditions and freedom from undue restraint. Thus, the *Youngberg* Court reasoned, involuntarily committed mental patients must have those rights because they cannot constitutionally be punished. Analogously, voluntary residents of schools for the mentally retarded cannot be punished and are entitled to rights of personal freedom at least as great as those of prison inmates.

737 F.2d at 1245–46.

The Court is not persuaded by *Society for Good Will.* The decision was handed down prior to *DeShaney,* wherein the Supreme Court indicated the importance of affirmative action by the state in the invocation of a constitutional duty to provide safe conditions. *DeShaney* itself may have had a harsh outcome, but the rationale underlying the decision is sound and clearly applicable to this case. The state acts to restrict an individual's liberty when it involuntarily commits him to a mental institution. Having done so, substantive due process requires that the restriction not unreasonably deprive the person of his liberty. Thus the constitutional right to safe conditions is a limitation on the state's power to restrict an individual's liberty. The state does not, however, owe a *constitutional* right to safe conditions to all persons on state property or who are cared for by state employees. The state of Tennessee has provided a remedy for injuries of this sort which are caused by the state in the form of the Tennessee Claims Commission.

*See* Tenn.Code Ann. § 9–8–301 to –308 (1987 & Supp.1989).

*Qualified Immunity*

█ Even if this Court were to agree with the Second Circuit that voluntary residents of a state institution are owed a constitutional duty of safe conditions, the defendants are entitled to qualified immunity because there was no such "clearly established" constitutional right at the time of Valion Jordan's death. In the Sixth Circuit, to determine whether a particular right is clearly established, a court must:

> examine initially, and most importantly, the decisions of the Supreme Court and the courts of [the Sixth Circuit]. If case law from these sources is unavailable, [the court] may also look for guidance to the cases of other circuits. [The Sixth Circuit] recognize[s], however, that *a single recent case from the court of appeals of another circuit is hardly sufficient to make the law "clearly established" in this circuit.*

*Eugene D. v. Karman,* 889 F.2d 701, 706 (6th Cir.1989). In *Eugene D.,* the Sixth Circuit held that a child in the custody of state-appointed foster parents had no clearly established right to be free from harm, even if the state was deliberately indifferent to injuries caused by the foster parents. The court gave *Youngberg* a very narrow interpretation, stating that the outcome of the case hinged on the state's removal of the individual from the community and his placement "under direct control of the institutional authorities." *Id.* at 710. Because there were "serious questions as to whether foster care is sufficiently analogous to institutionalization," the court refused to hold that the right claimed had been clearly established (the court also declined to establish it *in futuro* ). The Sixth Circuit's narrow reading of *Youngberg* indicates that the constitutional right claimed in the instant case also is not "clearly established," at least not in this circuit.

Further guidance on the "clearly established" issue is available in *Ohio Civil Services Employees Ass'n v. Seiter,* 858 F.2d 1171 (6th Cir.1988):

> [I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of the reasonable [state official] that his conduct, if challenged on constitutional grounds, would be found wanting. Here a mere handful of decisions of other circuit and district courts, which are admittedly novel, cannot form the basis for a clearly established right in this circuit.

*Id.* at 1177–78. The cases cited by the plaintiffs in the instant case do not meet the standards set out in *Seiter* for ascertaining "clearly established law." The cases merely reflect that a handful courts contend that the Supreme Court did not intend any significance in its limitation of *Youngberg* to involuntarily committed residents of state institutions. This Court declines to rely on the opinions of those courts as creating a "clearly established" constitutional right to safe conditions for voluntarily committed individuals.

The Tennessee Attorney General's office is representing only 13 of the 15 defendants in this case. The remaining two defendants, Renee Kimball and Sabrina Louvin, are represented by their own attorneys. Defendant Kimball has filed a one page motion for summary judgment which adopts the state's arguments in support of its motion. Defendant Louvin has filed no motion for summary judgment. Since qualified immunity applies to the actions of *all* of the defendants, however, the Court will dismiss the claims against all of the remaining 15 defendants.