Diane M. WILSON, By her plenary
Guardian, Thomas J. WILSON,
Plaintiff,

v.

Ugo FORMIGONI, Carlos Deeb and
Bruce Wlosinski, Defendants.

No. 92 C 5063.

United States District Court,
N.D. Illinois, E.D.

Aug. 9, 1993.

Patrick Joseph Cullinan, Smith, Williams & Lodge, Chicago, IL, for plaintiff.

Kathleen Kreisel Flahaven, IL Atty. General's Office, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

This is a section 1983 action involving the right of a mental patient to reasonably safe terms and conditions of confinement. Twice, we have dismissed the Complaint and twice an Amended Complaint has been filed. This matter is before us today on the Defendants' third Motion to Dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, we grant the motion in part and deny it in part.

### Background

As in a recent case before the United States Supreme Court, "the facts of this case are undeniably tragic." *DeShaney v. Winnebago Cty. Social Servs. Dep't,* 489 U.S. 189, 191, 109 S.Ct. 998, 1001, 103 L.Ed.2d 249 (1989). Plaintiff Diane Wilson is a severely disturbed patient at the state-run Madden Mental Health Facility ("Madden") in Hines, Illinois. Ms. Wilson has a lengthy history of stays in mental facilities throughout the midwest and also has a recorded history of fleeing those facilities and placing herself in positions of extreme danger. During these forays, she has been found wandering at the airport, sleeping on the highway, and willingly getting into a van of armed men she did not know. Indeed, it is the tragic result of one of Wilson's many such adventures that led to the allegations in the present case.

When Wilson was brought to Madden in July 1990, it was pursuant to a pending petition for involuntary commitment. (Compl. ¶¶ 19–21.) However, the staff at Madden was able to persuade Wilson to agree to a voluntary commitment by informing her that she would lose no rights as a result. (Compl. ¶ 24.) Plaintiff remained at Madden until her discharge on September 4, 1990. On September 25, 1990, she was transferred back to Madden, again pursuant to a petition for involuntary admission. (Compl. ¶ 29.) Once again, the Madden staff was able to persuade the Plaintiff to submit to voluntary admission. (Compl. ¶ 31.)

Though she was technically a voluntary patient, between July 21, 1990 and November 1, 1991, Wilson made nine written requests to be released from Madden. (Compl. ¶ 33.) After each written request was made, the staff was able to persuade Wilson to withdraw it. (Compl. ¶ 34.) During the same period, Wilson also made seven oral requests to be released which were simply ignored by the Madden staff. (Compl. ¶ 36.)

On at least one occasion in March 1991, the staff was unable to persuade Wilson to rescind her written request for release. In response, the staff members prepared and filed a petition for involuntary admission in the Circuit Court of Cook County. Wilson was then convinced to rescind her request to be released. (Compl. ¶ 35.) Though the Complaint does not specifically state that the petition was used to coerce Wilson, it is a reasonable inference to draw at this stage of the proceeding.

Despite her tendency to flee and despite the fact that Wilson had recently told a Madden staff member that "voices" were telling her to run away, Wilson was never placed in a locked care unit at Madden.[1] When Wilson attended a therapy session in a Madden building separate from her dormitory, a note

---

1. Madden has no fence or wall surrounding it or any security system of any type.

was prepared by the charge nurse and sent to the person in charge of the therapy session instructing him or her to see that Wilson was escorted back to her unit. However, Wilson was allowed to leave the session unescorted and fled the premises. She was found severely injured and unconscious four hours later, several miles away from Madden. So severe were her injuries that they required a lengthy hospital stay, and despite the passage of eighteen months since the incident, Ms. Wilson remains unable to explain what happened to her.

Plaintiff filed this suit seeking damages for Wilson's injury from those at Madden responsible for her care and treatment. Defendant Formigoni is the director of the Madden facility. Defendant Deeb was a psychiatrist at Madden who had been treating the Plaintiff. Defendant Wlosinski was a social worker at Madden whose responsibilities included monitoring Wilson's condition. The Defendants are sued in their individual capacities.

We dismissed the original Complaint on federal constitutional and Illinois law grounds. *See Wilson v. Formigoni*, No. 92 C 5063, 1992 WL 345399 (N.D.Ill. filed Nov. 16, 1992) (Plunkett, J.). Plaintiff filed an Amended Complaint that essentially restated the allegations of the original while correcting the deficiencies we had noted. However, the Amended Complaint did not indicate whether the Plaintiff was voluntarily or involuntarily committed at Madden, a fact we found essential to our decision on the motion. Thus, we dismissed the Amended Complaint as well. *See Wilson v. Formigoni*, No. 92 C 5063 (N.D.Ill. filed Mar. 15, 1993) (Plunkett, J.).

The Plaintiff filed a Second Amended Complaint which alleges the facts recited above. It also alleges that, although Wilson was technically committed voluntarily, the circumstances of her confinement were equivalent to a de facto involuntary commitment.

The Second Amended Complaint contains five counts. Count I charges all Defendants with violations of Wilson's substantive due process rights in that they failed to install fences and other security equipment at Mad-

den, failed to require that she be kept in a locked care unit, and failed to insure that all Madden employees who dealt with Wilson were familiar with her psychiatric history. *See* 42 U.S.C. § 1983.

Count II is a claim for a violation of procedural due process. It alleges that the Defendants violated Ms. Wilson's rights by persuading her to voluntarily commit herself to Madden rather than initiating the procedure for an involuntary commitment pursuant to the Illinois Mental Health Code. *See* 42 U.S.C. § 1983; 405 ILCS 5/3–700 *et seq.* Counts III, IV and V charge Defendants Formigoni, Deeb and Wlosinski respectively with negligence. Each count seeks $1,000,-000.00 in damages from the Defendants named therein.

### *Discussion*

■ On a motion to dismiss, the court views the allegations of the complaint as true, along with reasonable inferences therefrom, and views these in the light most favorable to the plaintiff. *Dawson v. General Motors*, 977 F.2d 369, 372 (7th Cir.1992); *Powe v. Chicago*, 664 F.2d 639, 642 (7th Cir.1981). A complaint should not be dismissed with prejudice unless it appears beyond doubt that the plaintiff is unable to prove any set of facts consistent with the complaint which would entitle the plaintiff to relief. *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir.1992). Unless otherwise provided by Rule 9 of the Federal Rules of Civil Procedure, facts need not be plead with particularity. *Leatherman v. Tarrant County Narcotics and Intelligence Unit*, — U.S. —, —, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993). Nevertheless, a plaintiff must allege sufficient facts to outline the cause of action, proof of which is essential to recovery. *Ellsworth v. Racine*, 774 F.2d 182, 184 (7th Cir.1985) (citations omitted), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986).

### I. *Substantive Due Process*

■ As we explained in our earlier opinion, the Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty,

or property, without due process of law." U.S. Const., amend. XIV. Plaintiff argues that her right to reasonably safe confinement under the Fourteenth Amendment was violated by the Defendants. Defendants argue that, because the Plaintiff was voluntarily committed at Madden, she is not entitled to due process protection.

Certainly, the rights of involuntarily committed mental patients to reasonably conditions of care and safety in their confinement is well-established. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that patients in mental health facilities have due process rights to reasonable care and safety. *Id.* at 324, 102 S.Ct. at 2462. Though *Youngberg* involved an involuntarily committed mental patient, many courts extended its due process protections to voluntarily committed patients as well. *See, e.g., Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1245–46 (2d Cir.1984) (*Youngberg* applies equally to voluntarily committed); *Goodman v. Parwatikar,* 570 F.2d 801, 804 (8th Cir.1978) (voluntary and involuntary admittees have same constitutional rights to safe environment); *Harper v. Cserr,* 544 F.2d 1121, 1123 (1st Cir.1976) (though voluntary patients do not have same right to treatment as involuntary patients, court considered admission of patients who are helpless or confined to be de facto involuntary). *Cf. Phillips v. Thompson,* 715 F.2d 365, 367 (7th Cir.1983) (does not decide whether voluntari-

ness affects scope of constitutional rights of residents).[2]

However, the scope of a due process right to safety has recently been narrowed by the Supreme Court. In *DeShaney v. Winnebago County Social Servs. Dept.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Court held that a social agency had no duty under the due process clause to protect a boy who was severely beaten by his father despite the attempts of the mother to get the agency to intervene. The Court held that because the state had taken no affirmative action to deprive the child of his liberty, and thus his ability to care for himself, no due process right to safety had arisen. *Id.,* 489 U.S. at 199–200, 109 S.Ct. at 1005–1006 (where the state, by affirmative exercise of its power, "so restrains an individual's liberty that it renders him unable to care for himself," it is obligated to provide necessities of life, including reasonable safety).

Though *DeShaney* did not involve the rights of institutionalized mental patients to reasonable care and safety, the courts have interpreted its holding in that context to mean that involuntarily committed patients have due process rights to reasonable care and safety while voluntarily committed patients generally do not. *See Monahan v. Dorchester Counseling Ctr., Inc.,* 961 F.2d 987, 990–94 (1st Cir.1992) (*DeShaney* limits *Youngberg*'s "clearly defined" right to involuntarily committed patients); *Higgs v. Latham,* 946 F.2d 895 (6th Cir.1991) (Table of Decisions, text in WESTLAW) (due process

**2.** *See also Clift v. Fincannon,* 657 F.Supp. 1535, 1546 (E.D.Tex.1987) (voluntarily committed have same rights as involuntarily committed); *Fialkowski v. Greenwich Home for Children, Inc.,* 683 F.Supp. 103, 105 (E.D.Pa.1987) (rejecting voluntary/nonvoluntary distinction in motion to dismiss but summary judgment in favor of defendants later granted in light of *DeShaney*); *McCartney v. Barg,* 643 F.Supp. 1181, 1185 (N.D.Ohio 1986) (discarding argument distinguishing between voluntary and nonvoluntary patients as "hypertechnical" and not supported by *Youngberg*); *Kolpak v. Bell,* 619 F.Supp. 359, 377–78 (N.D.Ill.1985) (Getzendanner, J.) (rejecting voluntary/involuntary distinction and finding that certain types of "voluntary" admissions are, in fact, "involuntary"); *Rubacha v. Coler,* 607 F.Supp. 477, 479 (N.D.Ill.1985) (Shadur, J.) (in case involving involuntarily committed child, noting *Society for Good Will*'s extension of

*Youngberg* to **any** person in state custody); *Flowers v. Webb,* 575 F.Supp. 1450, 1454 (E.D.N.Y. 1983) (distinction between voluntary and involuntary is, in some cases, "illusory at best."); *Association for Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. 473, 485 (D.N.D.1982) (voluntary admittee retains constitutional right to "reasonably safe" environment), *aff'd in part, remanded in part,* 713 F.2d 1384 (8th Cir.1983); *Seide v. Prevost,* 536 F.Supp. 1121, 1136 (S.D.N.Y.1982) ("I conclude that the classification of admitted patients is a distinction without a difference in the determination of patients' rights to life and to personal liberty, and concomitantly to treatment."); *Naughton v. Bevilacqua,* 458 F.Supp. 610, 617–18 (D.R.I.1978) (relatively helpless, voluntary admittee has constitutional right to "safe and humane environment"), *aff'd,* 605 F.2d 586 (1st Cir.1979).

rights afforded only to involuntarily committed patients under *DeShaney* ); *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 466 (3d Cir.1990) (denying, based on *DeShaney*, due process claim of voluntarily committed patient's parents when patient was killed by negligence of facility staff); *Ridlen v. Four County Counseling Ctr.*, 809 F.Supp. 1343, 1355-57 (N.D.Ind.1992) (voluntarily committed patient cannot state a claim under due process); *Jordan v. Tennessee*, 738 F.Supp. 258, 259-61 (M.D.Tenn.1990) (right to reasonable care and safety clearly established as to involuntarily committed patients only); *Williams v. Hartman*, 413 Mass. 398, 597 N.E.2d 1024, 1027-28 (1992) (no claim under section 1983 for voluntarily committed patients). *But cf., Halderman v. Pennhurst State School and Hosp.*, 784 F.Supp. 215, 222 (E.D.Pa.1992) (distinguishing *DeShaney* and *Fialkowski* on the grounds of findings of fact that though only half of patients at mental hospital were actually committed by the court, all were essentially involuntarily committed because they had no alternative), *aff'd without op.*, 977 F.2d 568 (3d Cir.1992). The reason *DeShaney* mandates that result is clear: in the case of court-ordered commitment, the state has undertaken to deprive the patient of her liberty. *See DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005.

However, the mere use of the label "voluntary," without more, does not end our inquiry into the Plaintiff's due process rights to safety. Rather, a principled analysis of this question requires us to look at the actual circumstances of the Plaintiff's confinement as well as the label she wore. Under this analysis, the allegations in the Complaint make it clear to us that Ms. Wilson, despite technically being a voluntary patient at Madden, was anything but a willing guest.

Our analysis of the *Youngberg* right, which considers the actual circumstances of the patient's confinement as well as the technical label she wears, is supported by recent case law. The cases have noted that the key to *Youngberg* due process protection is whether or not some affirmative action is taken to deprive the plaintiff of her liberty. *See Monahan*, 961 F.2d at 991 (voluntary mental patient who injured himself jumping from van had no due process rights to safety because state did not take an affirmative act to restrain his liberty); *Higgs*, 946 F.2d 895 (issue of right to secure environment turns on "whether or not [the state] deprived [the patient] of her freedom to act on her own behalf"); *Horton v. Flenory*, 889 F.2d 454, 458 (3d Cir.1989) ("*DeShaney* requires that the state have imposed some kind of limitation on a victim's ability to act in his own interests"); *Jordan*, 738 F.Supp. at 260 ("In the instant case, the state did nothing affirmative to require [the decedent] to remain...."); *Ridlen*, 809 F.Supp. at 1355-57 (because no affirmative action was taken by state to deprive him of liberty, voluntarily committed patient who killed himself after leaving the facility and becoming an outpatient cannot state a claim under due process clause for failure to give needed care and treatment); *Williams*, 597 N.E.2d at 1027 ("In short, it is the State's holding of a mental health patient against his or her will that gives rise to the constitutional right to adequate medical care."). *See also Harper v. Cserr*, 544 F.2d 1121, 1123 (1st Cir.1976) (though voluntary patients do not have same right to treatment as involuntary patients, court considered admission of patients who are helpless or confined to be de facto involuntary).

In the present case, the Complaint alleges facts that, when taken as true, establish that Wilson was a de facto involuntary patient. We are presented with a case where an incompetent mental patient is technically voluntarily committed, but has made repeated unsuccessful attempts to be released. More importantly, there may be some evidence of affirmative action, in the form of coercion, on the part of the state to retain Wilson in custody.

██ Certainly, in trying to keep a severely ill patient like Wilson at Madden, the staff did what was in everyone's best interest. However, in overriding her will in order to do so, the staff transformed her voluntary commitment into an involuntary one, and gave rise to Wilson's due process rights under *Youngberg*. We hold that allegations of injury coupled with such circumstances ade-

quately state a claim for deprivation of due process under *Youngberg*. *See Halderman v. Pennhurst State Sch. and Hosp.*, 784 F.Supp. 215, 222 (E.D.Pa.1992) (where voluntarily committed mentally disabled persons had, in reality, no opportunity to leave mental hospital because of realities of situation including coercive actions of staff, patients were de facto involuntary), *aff'd without op.*, 977 F.2d 568 (3d Cir.1992). *Cf. Higgs*, 946 F.2d 895 (fact that a single nurse had suggested to plaintiff when she arrived that it would be better if she committed herself voluntarily was insufficiently coercive to constitute affirmative action on behalf of the state).

## A. Qualified Immunity

Defendants argue that even if Wilson's due process rights are implicate by their conduct, qualified immunity insulates them from monetary damages. We agree.

■ Our analysis of the qualified immunity question begins with *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), where the Supreme Court held that " 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Knox v. McGinnis*, 998 F.2d 1405, 1409 (7th Cir.1993) (*quoting Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738). *See also Williams v. Anderson*, 959 F.2d 1411, 1414 (7th Cir.1992); *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 401 (7th Cir.1993); *Warlick v. Cross*, 969 F.2d 303, 309 (7th Cir.1992); *Harms v. Godinez*, 829 F.Supp. 259, 264 (N.D.Ill.1993) (Plunkett, J.); *Wilson v. Formigoni*, No. 92 C 5063 at 5 (N.D.Ill. filed Mar. 15, 1993) (Plunkett, J.). Simply put, qualified immunity focuses on the "objective legal reasonableness" of defendants' conduct. *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038; *Marshall v. Allen*, 984 F.2d 787, 792 (7th Cir.1993).

■ As the Seventh Circuit has previously explained, "[a]ctions taken by local officials are considered objectively unreasonable only if the right allegedly violated is clearly established in a sufficiently particularized sense at the time of the actions at issue." *Hall v. Ryan*, 957 F.2d 402, 404 (7th Cir. 1992). *See also Marshall*, 984 F.2d at 792; *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986). Until a particular constitutional right has been stated so that reasonably competent officers would agree on its application to a given set of facts, it has not been clearly established. *Sherman*, 987 F.2d at 401; *Hall*, 957 F.2d at 404; *Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1578, 118 L.Ed.2d 220 (1992); *Auriemma v. Rice*, 910 F.2d 1449, 1453 (7th Cir.1990) (*en banc*), *cert. denied*, —— U.S. ——, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). Thus, qualified immunity is a defense "contingent on the state of the law." *Marshall*, 984 F.2d at 792; *Williams*, 959 F.2d at 1414; *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992).

■ The Seventh Circuit has developed a two-step analysis in qualified immunity cases. We first determine whether the alleged conduct violated the Plaintiff's constitutional rights, and then, if her rights were violated, whether they were clearly established at the time the violation occurred. *Sherman*, 987 F.2d at 401; *Fiorenzo v. Nolan*, 965 F.2d 348, 351–52 (7th Cir.1992); *Auriemma*, 910 F.2d at 1453.

■ We held above that Wilson has stated a claim for violation of her due process right to reasonably safe terms and conditions of confinement. Our remaining task, then, is to determine whether it was clearly established at the time of Wilson's injury that voluntarily committed mental patients have due process rights to safe confinement in circumstances such as in the present case. We hold that it was not.

As we noted above, prior to *DeShaney* a number of courts refused to distinguish between voluntary and involuntary mental patients for purposes of evaluating their constitutional rights. However, these cases are of

questionable validity in light of *DeShaney.* Here, the Plaintiff argues that the circumstances of her confinement made her commitment voluntary in name only. However, as the Defendant has pointed out, Plaintiff has cited no factually analogous post-*DeShaney* case that extends *Youngberg* to a de facto involuntary patient.

Indeed, we have found only one post-*DeShaney* case to recognize that some voluntary mental patients are, in reality, committed involuntarily. In *Halderman v. Pennhurst State School and Hosp.,* 784 F.Supp. 215, 222 (E.D.Pa.1992), *aff'd without op.,* 977 F.2d 568 (3d Cir.1992), decided five months before the injury in the present case, the court found that though only half of the patients at the particular mental hospital involved were actually committed involuntarily, all were essentially involuntarily committed because they had no viable alternative. Included among the numerous rationales for this was the fact that many "voluntary" patients were discouraged from seeking their release by the staff, who, if necessary, filed petitions for involuntary commitment to thwart attempts to leave. *See Halderman,* 784 F.Supp. at 222 (citing reasons for findings of fact in earlier opinion).

Certainly, this holding supports the Ms. Wilson position. However, the broad sweep of *Halderman,* which essentially discards the voluntary/involuntary dichotomy created by the other courts to address the issue, is insufficient to deprive the Defendants of qualified immunity in the present case. The fact that a single district court issued a favorable opinion does not make the rights of de facto involuntarily committed mental patients sufficiently particularized. To the contrary, it demonstrates that there is a conflict in the law. *See Jordan,* 738 F.Supp. at 261 (qualified immunity bars damages under due process clause for injury to voluntarily committed mental patient). Hence, the rights of *de facto* involuntarily committed patients were not sufficiently clear in the law so that reasonably competent officers would agree on their application to a given set of facts at the time of the injury. *Sherman,* 987 F.2d at 401; *Hall,* 957 F.2d at 404; *Henderson,* 940 F.2d at 1059; *Auriemma,* 910 F.2d at 1453.

Therefore, qualified immunity bars Count I, and it is dismissed.

## II. *Procedural Due Process*

Plaintiff's alternative argument is somewhat unique. She argues that by failing to proceed with an involuntary commitment petition, the Defendants deprived her of due process rights that would have been hers under *Youngberg* had she been involuntarily committed. *See Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (patient who was allowed to sign voluntary commitment forms when incompetent to consent stated claim for violation of procedural due process).

The focus in *Zinermon* was on the fact that the defendants, in allowing the Plaintiff to voluntarily commit himself when he was not competent to do so, robbed the Plaintiff of the procedural safeguards inherent in the involuntary commitment procedure. *See Zinermon,* 494 U.S. at 132–35, 110 S.Ct. at 987–88. The Supreme Court ruled that the Plaintiff had stated a claim for a procedural due process violation. *Id.*

Defendant argues that *Zinermon* is distinct from the present case because in *Zinermon* the plaintiff argued that he should not have been committed at all rather than that he should have been involuntarily committed. However, that distinction was not central to the Supreme Court's holding. To the contrary, the Court stated that the Plaintiff would be entitled to damages

> "[i]f he can show either that if the proper procedure had been followed he would have remained at liberty and that he suffered harm by being confined, **or that even if he would have been committed anyway under the involuntary placement procedure, the lack of this procedure harmed him in some way.**"

*Id.,* 494 U.S. at 134 n. 19, 110 S.Ct. at 988 n. 19 (emphasis added).

Thus, Wilson's claim is precisely the one recognized by the Supreme Court in *Zinermon:* she argues that the Defendants' failure to have her involuntarily committed harmed her by preventing her inclusion in the *Youngberg* due process protections. Indeed,

our finding that qualified immunity bars suit on the basis of *Youngberg* validates that argument. Thus, we hold that the Plaintiff's allegations that the Defendants coerced her to remain voluntarily as a patient at Madden when she clearly was incompetent to make such a decision states a claim for a violation of procedural due process under *Zinermon*.[3]

### A. Qualified Immunity

■ Of course, the Defendants argue that qualified immunity also bars the Plaintiff's procedural due process claim. We disagree. Though we found that a single and controversial district court case was insufficient to defeat Defendants' qualified immunity from the Plaintiff's substantive due process claim, we cannot say the same about clear authority from the United States Supreme Court. *Zinermon,* decided two years prior to the injury in the present case, clearly establishes that allegations such as those made here state a claim for a deprivation of procedural due process.

### III. State Law Claims

Counts III, IV and V are negligence counts against Formigoni, Deeb, and Wlosinski respectively. The Defendants attack these counts on several grounds.

First, the Defendants argue that these Counts must be dismissed because they do not adequately plead duty or causation. We disagree.

### A. Duty

■ The Complaint alleges that the Defendants owed Ms. Wilson a duty of reasonable care based upon their relationship with the Plaintiff. As to Deeb and Wlosinski, Wilson's treating psychiatrist and social worker, the duty is clear. As to Formigoni, the facility director, whether he personally dealt with the Plaintiff is less clear. However, in this negligence claim, *respondeat superior* is available to the Plaintiff and Formigo-

ni may have breached his duty to her by his failure to adequately supervise the other Defendants in their duties caring for her. To that extent, the existence of a duty is well pled.

However, we are troubled by the Plaintiff's claims that Formigoni breached his duty of care by failing to install a fence and/or other security devices at Madden. Those claims do not seem to be matters of medical judgment that are properly attacked in a malpractice action against an individual. Rather, they seem to be matters of state policy which must be attacked in the Illinois Court of Claims.

■ Under Illinois law, claims against the state may only be brought in the Court of Claims. *Currie v. Lao,* 148 Ill.2d 151, 170 Ill.Dec. 297, 299, 592 N.E.2d 977, 979 (1992). The issue here is whether these claims are in reality claims against the state so that the Illinois Court of Claims has exclusive jurisdiction over them.

■ Though the Complaint names the Defendants in their individual capacities, the determination of whether an action is in fact a suit against the state turns upon an analysis of the issues involved and the relief sought, rather than the formal designation of the parties. *Id.* (citing *Healy v. Vaupel,* 133 Ill.2d 295, 140 Ill.Dec. 368, 549 N.E.2d 1240 (1990) and *Robb v. Sutton,* 147 Ill.App.3d 710, 101 Ill.Dec. 85, 498 N.E.2d 267 (1986)). An action brought nominally against a state employee in his individual capacity will be found to be a claim against the state where a judgment for the plaintiff could operate to control the actions of the State or subject it to liability. *Currie,* 170 Ill.Dec. at 300, 592 N.E.2d at 980 (citing *Gocheff v. State Comm. College,* 69 Ill.App.3d 178, 25 Ill.Dec. 477, 386 N.E.2d 1141 (1979)). Though the Ms. Wilson seeks only money damages from the Defendants, the fact that fences and other security measures were not installed at Madden is a matter of state policy. Therefore, to the

---

**3.** Defendants also argue that the procedural due process claim should be dismissed because it does not allege that they had any personal involvement in the relevant conduct. At this stage of the proceeding, we reject that argument in light of the allegations in the Complaint that the

Defendants "either themselves or through the staff at Madden" persuaded Plaintiff to sign an application for voluntary admission and to rescind her written requests to be released. (Compl. ¶¶ 66, 70.)

extent the Complaint relies on the failure of the Defendants to install fences or other security devices, it is dismissed.

### B. Causation

The Defendants argue that the negligence counts must be dismissed because the sole proximate cause of Ms. Wilson's injury was the assault upon her by a person or persons unknown rather than any negligence on their part. Again, we must disagree.

■ In a negligence claim, the Plaintiffs must show duty, breach and causation. *See, e.g., American Nat'l Bank & Trust Co. v. National Advertising Co.*, 149 Ill.2d 14, 171 Ill.Dec. 461, 466, 594 N.E.2d 313, 318 (1992); *Schultz v. Hennessy Indus., Inc.*, 222 Ill. App.3d 532, 165 Ill.Dec. 56, 584 N.E.2d 235 (1991). Causation is an amalgam of two sub-elements, cause in fact and legal or proximate [4] cause. Cause in fact simply presents the familiar *sine qua non* test: but for the defendants' conduct, would the injury to plaintiff have occurred? *See, e.g.*, W. Page Keeton, *Prosser and Keeton on Torts* § 41 at 266 (5th ed. 1984). Defendants do not argue that cause in fact is lacking here.

■ Once the question of cause in fact has been dealt with, we must inquire into the issue of proximate cause. *Benner v. Bell*, 236 Ill.App.3d 761, 177 Ill.Dec. 1, 4, 602 N.E.2d 896, 899 (1992), *appeal denied*, 148 Ill.2d 639, 183 Ill.Dec. 15, 610 N.E.2d 1259 (1993). Proximate cause has been analyzed in endless variation by the courts, but is essentially a policy tool that allows courts to shield from liability those wrongdoers whose conduct is extremely remote from the injury to the plaintiff. *Benner*, 177 Ill.Dec. at 4, 602 N.E.2d at 899. Defendants seek to use that policy tool to bar the Plaintiffs from recovery.

■ Of course, there can be more than one act which creates the proximate cause of an injury. *Long v. Friesland*, 178 Ill.App.3d 42, 127 Ill.Dec. 85, 93, 532 N.E.2d 914, 922 (1988) (citation omitted). Where the injury is caused by the concurrent negligence of two parties and the accident would not have occurred without the negligence of both, both negligent acts are the proximate cause of the injury.

■ Defendants argue that any wrong that they are accused of did not cause the Plaintiffs' injuries. Rather, they assert that their conduct merely created a condition that allowed the Plaintiff to be injured through her own actions and the actions of others. *See, e.g., Gilbertson v. Rolscreen Co.*, 150 Ill.App.3d 192, 103 Ill.Dec. 637, 640, 501 N.E.2d 954, 957 (1986) (window manufacturer not liable to mental patient who kicked window out and was injured in jump to the ground). Indeed, it is a well-established tenet of Illinois law that the proximate cause of an injury is distinct from a condition that merely makes the injury to the plaintiff possible. *Lane v. Harvey*, 178 Ill.App.3d 270, 127 Ill.Dec. 457, 461, 533 N.E.2d 75, 79 (1988). This long-standing rule, which we refer to as the "cause/condition dichotomy," has been applied by numerous Illinois courts,[5] and it is this rule that the Defendants argue mandates dismissal of Counts

---

**4.** We have inherited the term "proximate" from Bacon's maxim *"In jure non remota causa, sed proxima, spectatur"* [In law the near cause, not the remote one, is looked to]. Lord Chancellor Bacon, Maxims of the Law, Reg. 1. That language, composed centuries ago, echoes throughout court opinions to this day.

**5.** *See, e.g. West v. Deere & Co.*, 145 Ill.2d 177, 164 Ill.Dec. 122, 124, 582 N.E.2d 685, 687 (1991); *Ball v. Waldo Township*, 207 Ill.App.3d 968, 153 Ill.Dec. 295, 298, 567 N.E.2d 10, 13 (1991); *Novander v. City of Morris*, 181 Ill.App.3d 1076, 130 Ill.Dec. 817, 818–19, 537 N.E.2d 1146, 1147–48 (1989) (township not liable when driver, who was trying to avoid potholes in the street, struck plaintiff); *Lindenmier v. City of Rockford*, 156 Ill.App.3d 76, 108 Ill.Dec. 624, 508 N.E.2d 1201 (1987) (city not liable for faulty traffic signal when driver chose to gamble and enter intersection); *Broussard v. Huffman Mfg. Co.*, 108 Ill.App.3d 356, 63 Ill.Dec. 854, 860, 438 N.E.2d 1217, 1223 (1982) (gas can manufacturer not liable to plaintiff whose son was burned when gas can spilled and somehow gas ignited), *appeal denied sub nom, Levin v. Welsh Bros. Motor Service, Inc.*, 119 Ill.2d 558, 119 Ill.Dec. 387, 522 N.E.2d 1246 (1988); *Barr v. Rivinius, Inc.*, 58 Ill.App.3d 121, 15 Ill.Dec. 591, 373 N.E.2d 1063, 1067 (1978) (collecting cases); *Merlo v. Public Serv. Co.*, 381 Ill. 300, 45 N.E.2d 665, 675 (1942); *Briske v. Village of Burnham*, 379 Ill. 193, 39 N.E.2d 976 (1942).

III, IV and V. Once again, we must disagree.

 Though recent courts have expressed confusion as to the proper analysis under the cause/condition dichotomy,[6] the analysis is simply a function of the intervening cause analysis:

> The test in determining whether both acts constitute concurrent proximate cause is whether the first wrongdoer might have reasonably anticipated or foreseen the intervening cause as a natural and probable result of the first wrongdoer's negligence.

*Long,* 127 Ill.Dec. at 93, 532 N.E.2d at 922 (citing *Merlo,* 45 N.E.2d at 675). Where an intervening action is not the natural or probable result of the first wrongdoer's negligence, the causal chain is broken and the original negligence is merely a condition to which no liability attaches. *Id.* (test is whether first wrongdoer could have anticipated intervening act). *See also Benner,* 177 Ill.Dec. at 5–6, 602 N.E.2d at 900–01 (recognizing that, with the adoption of comparative fault, a case may arise where plaintiff's own actions are an intervening cause).[7]

Thus, our inquiry is whether the Defendants could have reasonably foreseen that Ms. Wilson would attempt to escape Madden

if given the opportunity and that, if she did so, she would be in danger of harm. At this early stage of this proceeding, the record shows that such an incident was clearly foreseeable given Wilson's documented penchant for unsupervised forays, her blind trust of strangers, and her warning to a staff member that the "voices" were telling her to flee again. Further, unless the facts are undisputed and are such that there can be no difference in the judgment of reasonable persons as to the inferences to be drawn from them, foreseeability is a question of fact for the jury to decide. *Benner,* 177 Ill.Dec. at 4–5, 602 N.E.2d at 899–900; *Scott & Fetzer Co. v. Montgomery Ward & Co.,* 112 Ill.2d 378, 98 Ill.Dec. 1, 7, 493 N.E.2d 1022, 1028 (1986). Therefore, we decline to dismiss this case on causation grounds.

### C. *Social Worker Malpractice*

 In their Reply Brief, Defendants suggest that the Illinois courts have refused to recognize a cause of action for social worker malpractice. In support of this proposition, they cite cases from the Fourth District Appellate Court. *See e.g., Petrowsky v. Family Serv. of Decatur, Inc.,* 165 Ill.App.3d 32, 116 Ill.Dec. 42, 518 N.E.2d 664 (1987); *Martino v. Family Serv. Agency,* 112 Ill.

---

**6.** *See, e.g., Benner v. Bell,* 236 Ill.App.3d 761, 177 Ill.Dec. 1, 6, 602 N.E.2d 896, 901 (1992) (laments that the cause/condition rule provides no guidance on how courts are supposed to decide what constitutes a 'cause' conferring liability and what is merely a 'condition' that insulates the defendant).

**7.** The Illinois courts have remained faithful to this analysis: it is apparent that intervening causation is at the heart of the many decisions applying the cause/condition dichotomy. *See Deere & Co.,* 164 Ill.Dec. at 124, 582 N.E.2d at 687 (defendant's negligence a mere condition where unforeseeable combination of events led to injury); *Novander,* 181 Ill.App.3d 1076, 130 Ill. Dec. 817, 819, 537 N.E.2d 1146, 1148 ("[The third party]'s acts constitute the type of subsequent, independent act which becomes an effective intervening cause, breaking any causal connection between the [defendant]'s alleged negligence and the accident."); *Courtney v. Allied Filter Eng'g,* 181 Ill.App.3d 222, 129 Ill.Dec. 902, 908, 536 N.E.2d 952, 958 (1989) (cause/condition distinction applies to situations where "a new force intervenes after the forces set in operation by the defendant have come to rest in a

position of apparent safety," and holding that it was not unforeseeable that truck driver would try to manually reload a fallen pallet); *Gilbertson,* 150 Ill.App.3d 192, 103 Ill.Dec. 637, 641, 501 N.E.2d 954, 958 (1986) (citing cause/condition rule and deciding case on foreseeability of intervening act); *Duncavage v. Allen,* 147 Ill.App.3d 88, 100 Ill.Dec. 455, 460, 497 N.E.2d 433, 438 (1986) (noting application of rule), *appeal denied,* 113 Ill.2d 573, 106 Ill.Dec. 46, 505 N.E.2d 352 (1987); *Duncan v. Rzonca,* 133 Ill.App.3d 184, 88 Ill.Dec. 288, 301, 478 N.E.2d 603, 616 (1985); *Orrico v. Beverly Bank,* 109 Ill.App.3d 102, 64 Ill.Dec. 701, 706, 440 N.E.2d 253, 258 (1982) (noting this rationale and distinguishing rule); *Reed v. Danville Concrete Prod. Co.,* 102 Ill. App.3d 205, 57 Ill.Dec. 707, 429 N.E.2d 605 (1981); *See also* W. Page Keeton, *Prosser and Keeton on Torts,* § 42 at 278 (5th ed. 1984) (theory has been almost universally abandoned by the courts except in this form). *Cf. Falkenbury v. Elder Cadillac, Inc.,* 109 Ill.App.3d 11, 64 Ill.Dec. 628, 633, 440 N.E.2d 180, 185 (1982) (ignoring cause/condition dichotomy in case where buyer of car tried to repair broken wire wheel himself and was injured; issue was whether his decision to repair the wheel and his method of doing so was reasonably foreseeable).

App.3d 593, 67 Ill.Dec. 714, 445 N.E.2d 6 (1982).

Though the Defendants cite cases in their favor, the cases that they fail to cite show that this issue is not nearly as clear as they would lead us to believe. Other Appellate Districts have rejected *Martino* and allowed plaintiffs to proceed on claims of social worker malpractice. *See, e.g., Roe v. Catholic Charities,* 225 Ill.App.3d 519, 167 Ill.Dec. 713, 588 N.E.2d 354 (5th Dist.1992), *appeal denied,* 146 Ill.2d 651, 176 Ill.Dec. 821, 602 N.E.2d 475 (1992)); *Wogelius v. Dallas,* 152 Ill.App.3d 614, 105 Ill.Dec. 506, 511, 504 N.E.2d 791, 796 (1st Dist.1987) (listing elements of cause of action); *Horak v. Biris,* 130 Ill.App.3d 140, 85 Ill.Dec. 599, 603, 474 N.E.2d 13, 17 (2nd Dist.1985) ("Contrary to the reasoning set forth in the *Martino* decision, we believe that the facts alleged and admitted in the instant case are sufficient to establish a cause of action for social worker malpractice.") We are not free to simply ignore these cases as the Defendants have, and we reject the Defendants' argument that social worker malpractice is not recognized by the Illinois courts.

### D. *State Law Immunity*

Defendants finally argue that the negligence claims in this case are barred by various state law immunities including public officials' immunity and absolute immunity. However, the Defendants have made no showing that these doctrines apply here: these theories are only lightly touched upon in short paragraphs at the conclusion of the Defendants' briefing. Apparently, it is up to this court to discern on its own what the scope of these immunities is and whether or not they apply in the present case. Unfortunately, we have neither the time nor the inclination to make the Defendants' arguments for them and we decline their invitation to do so. Hence, we deny the motion to the extent it relies on state law immunities without prejudice. We note, however, that any attempt to make these arguments in the future should be supported by principled analysis.

### Conclusion

For the reasons stated above, the Defendants' Motion to Dismiss is granted in part and denied in part. Count I, the substantive due process claim, is dismissed as barred by qualified immunity. Count III, to the extent it relies on Defendant Formigoni's failure to install a fence or other security equipment at Madden, (*See* Compl. ¶ 65(a), (b)), is also dismissed pursuant to the doctrine of sovereign immunity. The remainder of the Complaint shall stand.